## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

FEDERAL INSURANCE CO., et al.,

   Plaintiffs,

        v.

EMPRESAS SABAER, INC., et al.,

   Defendants.

Civil No. 12-1113 (GAG)

## OPINION AND ORDER

Federal Insurance Company ("Federal") and DTC Engineering and Constructors, LLC ("DTC") (collectively "Plaintiffs") invoke diversity jurisdiction, 28 U.S.C. § 1332(a), in a contract dispute with Empresas Sabaer, Inc. ("Sabaer") and United Surety and Indemnity Co. ("USIC") (collectively "Defendants"). (See generally Docket No. 1.) The parties filed cross-motions for summary judgment. (See Docket Nos. 71 & 73.) They opposed each other's motions. (Docket Nos. 96 & 97.) Defendants replied to Plaintiffs' opposition. (Docket No. 102.) For the following reasons, the court **GRANTS in part** and **DENIES in part** Plaintiffs' motion for summary judgment at Docket No. 71 and **DENIES** Defendants' motion for summary judgment at Docket No. 73.

### I.    Standard of Review

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); see FED. R. CIV. P. 56(a). "An issue is genuine if 'it may reasonably be resolved in favor of either party' at trial, and material if it

Civil No. 12-1113 (GAG)

'possess[es] the capacity to sway the outcome of the litigation under the applicable law.'" Iverson v. City of Boston, 452 F.3d 94, 98 (1st Cir. 2006) (alteration in original) (internal citations omitted).

The moving party bears the initial burden of demonstrating the lack of evidence to support the non-moving party's case. Celotex, 477 U.S. at 325. "The movant must aver an absence of evidence to support the nonmoving party's case. The burden then shifts to the nonmovant to establish the existence of at least one fact issue which is both genuine and material." Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 581 (1st Cir. 1994). The nonmovant may establish a fact genuinely in dispute by citing particular evidence in the record or showing that either the materials cited by the movant "do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1)(B). If the court finds that some genuine factual issue remains, the resolution of which could affect the outcome of the case, then the court must deny summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

When considering a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party and give that party the benefit of any and all reasonable inferences. Id. at 255. Moreover, at the summary judgment stage, the court does not make credibility determinations or weigh the evidence. Id. Summary judgment may be appropriate, however, if the non-moving party's case rests merely upon "conclusory allegations, improbable inferences, and unsupported speculation." Forestier Fradera v. Mun. of Mayaguez, 440 F.3d 17, 21 (1st Cir. 2006) (quoting Benoit v. Technical Mfg. Corp., 331 F.3d 166, 173 (1st Cir. 2003)). "The presence of cross-motions for summary judgment neither dilutes nor distorts this standard of review." Lopez & Medina

2

Civil No. 12-1113 (GAG)

Corp. v. Marsh USA, Inc., 667 F.3d 58, 63 (1st Cir. 2012) (quoting Mandel v. Bos. Phoenix, Inc., 456

F.3d 198, 205 (1st Cir. 2006)).

## II.    Factual and Procedural Background

Federal is an Indiana corporation with its principal place of business in New Jersey.  (Docket No.

73-1 ¶ 1.) DTC is a Connecticut-registered limited liability company with its principal place of business

in Connecticut.  (Id. ¶ 2.)  Sabaer and USIC are Puerto Rico corporations with their principal places of

business in Puerto Rico.  (Id. ¶¶ 3-4; see also Docket No. 96-1 ¶ 1 (Defendants' Opposing Statement of

Facts stating none of these facts are material).)

On September 8, 2009, DTC and the U.S. Army Corps of Engineers (the "USCE") entered into

a  contract (the "Prime Contract") for the design and construction of the Armed Forces Reserve Center

at Fort Buchanan, located in Guaynabo, Puerto Rico (the "Project").  (Docket No. 73-1 ¶ 5.)  Federal and

DTC subscribed to payment and performance of bond number 83039488 as surety and principal,

respectively, naming the United States as obligee.  (Id. ¶ 6.)

DTC subsequently entered into a subcontract agreement (the "Subcontract Agreement" or

"Subcontract") with Sabaer and BBS Developers, S.E. ("BBS") (collectively the "Subcontractors") on

June 16, 2010.  (Id. ¶ 8.)  USIC and the Subcontractors, as surety and principal, respectively, subscribed

to payment and performance of bond number 10139254 for $2,038,500 and named DTC as obligee.  (Id.

¶ 9; see also Docket No. 96-1 ¶ 1 (Defendants' Opposing Statement of Facts stating none of these facts

are material).)  DTC conveyed and assigned to Federal all of its rights emerging from the Subcontract and

USIC's bond.  (Docket No. 73-1 ¶ 7.)  Sabaer was required to complete the obligations of the Subcontract

Agreement; BBS was responsible for providing technical and economic support.  (Docket No. 73-1 ¶¶

3

Civil No. 12-1113 (GAG)

10-11; see also Docket No. 96-1 ¶ 2.)

The Subcontract Agreement required the Subcontractors' official representative to attend weekly project meetings.  (Docket No. 73-1 ¶ 12.)  Sabaer served as the Subcontractors' representative at all times, and no one from BBS ever attended a weekly project meeting.  (Id. ¶¶ 13, 15.)  The Subcontractors were required to submit a joint daily report and monthly payment applications with supporting documents and affidavits.  Only Sabaer undertook these responsibilities.  (Id. ¶¶ 16-21.)  Checks payable were issued only to Sabaer, and "[a]ll [s]ubcontract-related discussions, negotiations, communications, billings and payments were made with [Sabaer as] Subcontractors['] official representative."  (Id. ¶¶ 25-27; see also Docket No. 96-1 ¶ 1 (Defendants' Opposing Statement of Facts stating none of these facts are material).)

On September 28, 2011, Federal exercised its right to complete the Project and executed a takeover agreement with USCE and DTC.  (Docket No. 73-1 ¶ 28.)  On October 18, 2011, Federal notified Sabaer, USIC, and BBS of "deficiencies in the form of an incorrectly installed silt fence and concrete pads that were rejected by quality control," claiming, "[Sabaer] has failed to remove two large piles of waste soil despite numerous requests for removal having been made by DTC and our consultants."  (Docket No. 73-1 ¶¶ 30-31.)  On the same day, Federal informed Sabaer, USIC, and BBS that it "was considering declaring them in default of the Subcontract Agreement" and requested a conference with them to discuss completion of the terms of the Subcontract Agreement.  (Id. ¶ 32; see also Docket No. 96-1 ¶ 1 (Defendants' Opposing Statement of Facts stating none of these facts are material).)

Plaintiffs claim that Defendants defaulted by not curing the purported deficiencies within three days of notice.  (Docket No. 73-1 ¶ 33.)  Defendants counter that "nowhere in Federal's letter of October

4

Civil No. 12-1113 (GAG)

18, 2011 is a statement granting Sabaer the [contractually required] term of three (3) days [to cure the alleged defects]." (Docket No. 96-1 ¶ 4.)  The discrepancy lies in the content of two letters dated October 18, 2011: one sent to Sabaer and one sent to USIC.  The letter to Sabaer notifies it of the alleged deficiencies but fails to specifically threaten termination, and Plaintiffs did not copy BBS on the letter. (See Docket No. 83-1.)  The letter to USIC clearly informs it that Federal considered whether to terminate Sabaer for the alleged deficiencies.  (See Docket No. 83-3.)  Federal sent a carbon copy of the second letter threatening termination to both Sabaer and BBS, though not to their address listed in the Subcontract.  (See id. at 2.)

On October 26, 2011, Federal sent Sabaer another letter expressing its desire to meet with representatives from Sabaer and USIC to discuss the allegedly uncured deficiencies.  (See Docket No. 83-4.)  Plaintiffs also claim they emailed Sabaer a more thoroughly descriptive deficiency list on October 26, 2011.  The email to which the deficiency list was attached, however, does not list a date in the heading (though the sender notes the date as "10/18/11" in the subject line).  (See Docket No. 83-5.)  Furthermore, Sabaer's representative clearly states that, at least initially, the deficiency list was not attached.  (Id.) Sabaer maintains that this email also failed to notify Defendants of "the three (3) days term provided by the Subcontract to cure the alleged deficiencies."  (Docket No. 96-1 ¶ 6.)

On November 10, 2011, Federal sent letters to USIC and Sabaer at their contractual addresses of record stating that Federal intended to formally terminate Sabaer for default pursuant to Section 8 of the Subcontract Agreement.  (See Docket No. 83-6.)  The letter also states, "In addition, your surety has not contacted our representative to arrange a meeting to discuss the deficiencies in your work within fifteen (15) days as required under your Performance Bond."  (Id.)  Plaintiff claims that Sabaer had still not

Civil No. 12-1113 (GAG)

remedied the deficiencies by November 15, 2011.  (See Docket No. 73-1 ¶ 37.)  On the same date,

Federal formally declared Sabaer in default by letter addressed to USIC, providing Sabaer and BBS with

carbon copies by mail.  (See Docket No. 84-1 at 1.)  Sabaer's response to Plaintiffs' timeline of events

is simply that Plaintiffs never provided BBS with the contractually requisite three days notice prior to

termination for default, Plaintiffs improperly characterize the correspondence as notice because the

correspondence was neither addressed to BBS nor sent to the address listed in the Subcontract, and BBS

had the same duties as Sabaer under the Subcontract Agreement.  (See Docket No. 96-1 ¶¶ 7-9.)

    Federal avers it incurred $268,233.62 in expenses for correcting Sabaer's defective work, in

addition to fees and costs.  (See Docket No. 73-1 ¶ 45.)  Plaintiffs claim that, based upon the terms of the

Subcontract, they are entitled to attorney's fees and costs and ten percent of the expenses incurred as an

overhead fee.  (Id. ¶ 46.)  Defendants respond plainly, "Federal has not presented any supporting evidence

as to the nature of the deficiencies identified and a breakdown for their correction."  (Docket No. 96-1

¶ 14.)

    The Subcontract Agreement states:[1]

> With respect to any controversy between Contractor and Subcontractor .
> . . Contractor shall issue a decision which shall be final and binding
> unless, within fifteen (15) business days of receipt, the Subcontractor files
> a notification in writing of its intent to arbitrate the controversy in
> accordance with Paragraph 9.c.  Notification of any such claim under this
> Paragraph 9.b must be submitted in writing within ten (10) days of
> Subcontractor's awareness of the facts underlying the claim.  Failure of
> Subcontractor to submit timely its notice of claim or notice of intent to
> arbitrate shall constitute an absolute bar and complete waiver of
> Subcontractor's right to recover on account of such claim.

---

[1] Importantly, the Subcontract Agreement is governed by Connecticut law without regard
to conflict of law principles.  (See Docket No. 77 at 10-11.)

Civil No. 12-1113 (GAG)

(Docket No. 77 at 7.)  Plaintiffs claim that Defendants failed to adhere to this provision by failing to timely request arbitration.  (See Docket No. 73-1 ¶¶ 41-44.)  Defendants do not refute the assertion; rather, they claim inadequate notice of intent to terminate by default because: 1) Federal's October 18th letter did not constitute proper notice; 2) Federal's November 15th letter failed to properly notify BBS; 3) termination for default is not governed by Article 9 of the Subcontract, and; (4) Federal's determination was not final and was conditioned to the completion of the investigation conducted by Federal's representatives.  (See Docket No. 96-1 ¶¶ 11-13.)  If the Subcontractors were wrongfully terminated for default, furthermore, the termination would be deemed a termination for convenience.[2]  (See Docket No. 71-2 at 2.)

Separate from this series of events, on August 12, 2011, Sabaer claimed Federal owed monies totaling $252,178.44, and USIC also lays claim to this money in its counterclaim.  (Docket Nos. 36 at 7-9; 97-1 ¶ 19.)  As part of ongoing discussions, Sabaer requested a status update on October 26, 2011.

_____

[2] The "Termination for Convenience" section states:

> Contractor shall have the right to terminate this Subcontract, in whole or part, for its own convenience and regardless whether there is a termination of Contractor's contract with [USCE], by providing Subcontractor with a written notice of termination, to be effective upon receipt by Subcontractor.  If the Subcontract is terminated for convenience, the Subcontractor shall be paid the amount representing costs which are due from the [USCE] for its Work, as provided in the Prime Contract Documents, after payment therefore by the [USCE] to Contractor.  The Subcontractor's remedy under this Article 13 shall be exclusive and in no event will Subcontractor be entitled to recovery of any anticipatory profits, overhead, or damages.

(Docket No. 71-2 at 3.)

Civil No. 12-1113 (GAG)

(Docket No. 97-1 ¶ 20.) On the same day, Federal denied Sabaer's claim. (Id. ¶ 21.) Neither Sabaer nor BBS filed a "notification in writing of [their] intent to arbitrate the controversy" within fifteen days after they were served with Federal's denial of the claim for payment. (Id. ¶ 22.) Defendants claim that Federal's determination "was not final and was conditioned to the completion of the investigation conducted by Federal's representatives." (Docket No. 96-1 ¶ 13.) Federal admits that the arbitration clause applies to "controversies arising during the prosecution of the [Project]." (Docket No. 96 at 11.)

III.   **Discussion**

The court is asked to resolve whether Plaintiffs properly notified the Subcontractors of their intent to terminate and whether Plaintiffs or Defendants failed to abide by the Subcontract's terms in demanding payment for completed work.

A.   Notice of Termination for Default

Resolving whether Sabaer and BBS were properly notified requires analyzing: 1) the terms of the Subcontract itself, and; 2) whether Plaintiffs needed to, and actually did, provide notice to BBS.

1.   **The Subcontract**

The relevant sections of the contract are titled "Subcontractor's Failure to Perform" and "Notice." (See Docket No. 77 at 6-7; 10.) Under the "Subcontractor's Failure to Perform" section, if the Subcontractor fails to abide by the substantive provisions of the Subcontract, "after serving three (3) days written notice, unless the condition specified in such notice shall have been eliminated within such three (3) days, the Contractor may at its option . . . terminate for default the Subcontractor's right to proceed under the Subcontract." (Id. at 6.) Under the "Notice" section, the Subcontract states, "All notices shall be addressed to the Parties at the addresses set out herein, and shall be considered as delivered when

Civil No. 12-1113 (GAG)

postmarked, if dispatched by registered mail, or when received in all other cases, including facsimiles."

(Id. at 10.)

The progression of events is simple. Federal sent letters to USIC and Sabaer on October 18, 2011, October 26, 2011, November 10, 2011, and November 15, 2011. These letters indicate that Federal took issue with Sabaer's performance, and the November 10th and November 15th letters unquestionably threaten and invoke termination for default for the reasons stated in the October 18th letter; namely, the incorrectly installed silt fence, concrete pads that were rejected by quality control, and the two large piles of waste soil.

The basis for these letters is the Subcontract section titled "Subcontractor's Failure to Perform." "If . . . Subcontractor shall at any time . . . fail to comply with all provisions of this Subcontract . . . then, after serving three (3) days written notice . . . the Contractor may . . . terminate for default . . . ." (Docket No. 77 at 6.) The specific duties that Defendants allegedly neglected are found in attachments to the Subcontract. (See e.g., id. at 15-16 (Subcontractor shall "[p]rovide clean-up as may be required" and install "concrete pads").) Alleging deficiencies in these areas clearly placed Sabaer and USIC on notice that they violated the terms of the Subcontract.

The headlining bout between Plaintiffs and Defendants concerns whether BBS received adequate notice pursuant to the Subcontract. "Notice[]," as in "three (3) days written notice," was required to be sent to the addresses of the "Parties" to the Subcontract. (Id. at 10.) "Parties" is defined in the opening paragraph of the Subcontract. (Id. at 1.) "Parties" means DTC ("Contractor"), and "Subcontractor." (Id.) "Subcontractor" means "BBS Developers, S.E. and Empresas Sabaer, Inc." according to its definition in the third line of the introductory paragraph. (Id.) Thus, "Parties" means DTC, BBS, and Sabaer. The

9

Civil No. 12-1113 (GAG)

"address[] set out" in the Subcontract for both BBS and Sabaer is 65 Infanteria Station, San Juan, Puerto Rico 00929. Therefore, "three (3) days written notice" should have been provided to both BBS and Sabaer at that address because the definition for "Parties" includes BBS and Sabaer.

   **2.**   **Notice to BBS**

   On October 18, 2011, Federal sent USIC a letter stating, "[W]e are considering declaring a Contractor Default and hereby request to arrange a conference with Sabaer and a representative of your company to discuss methods of the completion of the performance required by Sabaer under its Subcontract with DTC." (Docket No. 83-3.) Federal sent a carbon copy of that letter to BBS and Sabaer at the address of Calle Lepanto URB, El Alamein, San Juan, Puerto Rico 00926. (Id.) Another letter was sent to the Subcontractors at the same address on November 15, 2011, formally declaring the Subcontractors terminated for default. While this address is listed as BBS's address on the performance bond, the address of 65 Infanteria Station, San Juan, Puerto Rico 00929 is listed as BBS's address on the Subcontract. (See Docket Nos. 77 at 1; 77-1 at 1.) However, Sabaer received the letters at the Infanteria Station address and the address listed on the performance bond, demonstrating actual notice of Federal's intent to terminate due to default. (See Docket Nos. 97-4; 97-5; 97-7.) But Sabaer's receipt does not necessarily mean that, as a matter of fact, BBS also received notice. Indeed, BBS's administrative partner, Isaac Sanchez, submitted an affidavit that the November 10, 2011 letter was never received prior to termination and that BBS never received notice of termination for default. (See Docket No. 71-6.)

   As a matter of Connecticut law, however, Plaintiffs adequately notified BBS. An axiomatic principle of contract law holds that when a contract's language has plain meaning and its intent is clear, its clauses cannot be enlarged by construction. See e.g., Gateway Co. v. DiNoia, 654 A.2d 342, 347

Civil No. 12-1113 (GAG)

(Conn. 1995).  The contract plainly states that notice shall be provided to both BBS and Sabaer in writing at the Infanteria Station address on the Subcontract.  Plaintiffs did not do this.  Thus, the inquiry should cease, but Connecticut law holds otherwise.

In 1914, the Supreme Court decided <u>Tevis v. Ryan</u>, holding that notice to one joint contractor sufficed as notice to a second joint contractor.  233 U.S. 273, 287-88 (stating "notice to either was notice to both").  The Second Circuit later adopted this rationale.  <u>Hallenbeck v. Fleisher Eng'g & Constr. Co.</u>, 107 F.2d 925 (2d Cir. 1939) (Hand, J.), <u>aff'd</u>, 311 U.S. 15 (1940).  In <u>Hallenbeck</u>, the Second Circuit found that written notice sent by mail that "reached one of the two contractors who had jointly and severally agreed to perform the contract" sufficiently placed both joint contractors or obligors on notice. <u>Hollenbeck</u>, 107 F.2d at 929.

In the 1990's, Connecticut breathed life into <u>Hallenbeck</u>'s principles when examining a mortgage deed's notice requirements for default.  <u>See e.g.</u>, <u>Citicorp Mortg. Inc. v. Porto</u>, 677 A.2d 10, 12-13 (Conn. App. 1996) (citing <u>Hallenbeck</u>); <u>see generally</u> <u>Ge Capital Mortg. Servs v. Miller</u>, Civ. No. 94-0056950 S, 1995 WL 513167 (Conn. Super. Aug. 23 1995) (same).  Because "[c]onstruction of a mortgage deed 'is governed by the same rules of interpretation that apply to written instruments or contracts generally'" in Connecticut, <u>Hallenbeck</u>'s notice doctrine, that notice to one joint obligor implies notice to all, logically encompasses all Connecticut contract law.  <u>Porto</u>, 677 A.2d at 12 (citation omitted).

In <u>Porto</u>, the Connecticut appeals court noted that a mortgage deed required the plaintiff to give notice of default to the defendant.  <u>Id.</u> at 11.  When notice was sent to the defendant's former spouse at the contractually listed address and not to the defendant's new address, the court concluded that the plaintiff provided proper notice.  <u>Id.</u> at 13.  The court held, "Notice to one of two joint obligors conveys

11

Civil No. 12-1113 (GAG)

notice to the other with respect to matters affecting the joint obligation." Id.

In Miller, the Connecticut superior court also considered mortgage deeds tantamount to general contracts. Miller, Civ. No. 94-0056950 S, 1995 WL 513167, at *9. The court held, "Where two or more persons are subject to a duty or obligation upon notice, and there is no specific statutory or contractual requirement[3] to the contrary, a notice addressed to all and served on one is notice to all." Id. at *10-11 (citations omitted). It reiterated, "Notice to one of two joint obligors or contractors [h]as always been held to convey notice to the other with respect to matters affecting their joint obligation." Id. at *11 (citing Hallenbeck, 107 F.2d at 929).

In Connecticut,

> Where the question whether proper notice was given depends on the construction of a written instrument or the circumstances are such as lead to only one reasonable conclusion, it will be one of law, but where the conclusion involves the effect of various circumstances capable of diverse interpretation, it is necessarily one of fact for the trier.

Porto, 677 A.2d at 11 (quoting Truslow & Fulle, Inc. v. Diamond Bottling Corp., 151 A. 492, 495 (Conn. 1930)) (quotation marks omitted). The court thus addresses why, as a matter of law, the circumstances here lead to only one reasonable conclusion and no contractual requirement to the contrary overcomes Miller and Porto.

BBS's agreements with Sabaer and its actions during the life of the Subcontract reveal that it was inextricably intertwined with and reliant upon Sabaer. Sabaer ostensibly performed all of the duties under

---

[3] The court subsequently explains why the contractual requirement that notice be sent to the Infanteria Station is overcome not only by Porto and Miller, but also by the Subcontract's requirement that Defendants subscribe to a performance bond in which Defendants included a second address to which Plaintiffs sent notice.

Civil No. 12-1113 (GAG)

the Subcontract.  It represented itself and BBS at all times when meeting with Plaintiffs, attended weekly

project meetings on its own and BBS's behalf, submitted daily reports and monthly payment applications

on its own and BBS's behalf, received checks payable, and engaged in all "Subcontract-related

discussions, negotiations, communications, billings and payments" with Plaintiffs.  (See generally Docket

No. 73-1 at 4-5.)  These proffers, disputed only by Defendants as "immaterial," reveal that BBS

substantially relied on Sabaer to fulfill the terms of the Subcontract.  Indeed, the Subcontract and

performance bond state that the two shared a common address.

Plaintiffs sent Sabaer and BBS the October 18th letter to the Calle Lepanto address listed on the

performance bond.  Sabaer received the letter; yet, BBS claims it did not.  Plaintiffs sent Sabaer the

October 26th letter to the Infanteria Station address, in which they referenced the October 18th letter and

"the performance issues that have been discovered on this project."  (Docket No. 83-4.)  Plaintiffs copied

USIC on the letter but failed to copy BBS.  On November 10th, Plaintiffs followed up with another letter

to Sabaer's Infanteria Station address and specifically stated their intention to formally terminate for

default.  Plaintiffs copied USIC on the letter, and although BBS was not included, Porto and Miller

mollify the court's concern that notice was improper.  See Am. Auto Trimming Co. v. Lucas, 37 F.2d

801, 804 (D.C. Cir. 1930) (adopting the notice-to-one, notice-to-both rule where two companies occupied

a common office).  On November 15th, Plaintiffs sent two letters formally terminating the Subcontractors

for default: one to USIC and one to Sabaer.  Plaintiffs copied BBS on the USIC letter and sent it to the

Calle Lepanto address listed on the performance bond, and the Sabaer letter went to the Infanteria Station

address listed on the Subcontract.  See id.  Sabaer, a joint obligor, received proper notice at the

Subcontract address.  Having explained why notice sent to Sabaer at the Infanteria Station address also

13

Civil No. 12-1113 (GAG)

placed BBS on notice, the court turns to why notice was also properly sent to the Calle Lepanto address listed on the performance bond.

Plaintiffs sent BBS the letters to the address listed on the performance bond on October 18th and November 15th. BBS signed the performance bond, which included its new address, subsequent to entering into the Subcontract. (See Docket Nos. 40-2 at 1; 77 at 12; 97-7 at 8.) The "Notices" section of the Subcontract requires notice addressed to the addresses set out "herein," i.e., in the Subcontract. (Docket No. 77 at 10.) Within the Subcontract is a provision titled "Bonds," which required the Subcontractors to deliver a performance bond within ten days of signing the Subcontract. (Id. at 11.) In the performance bond, BBS listed the Calle Lepanto address as its address of record. (Docket No. 77-1 at 1.) Therefore, because the contract contemplated submission of a performance bond, BBS provided its address at the Calle Lepanto location on the bond, and the bond was signed subsequent to the Subcontract, the court concludes that notice was properly sent to this address. Connecticut's notice-to-one, notice-to-both doctrine also supports this finding. Notice was proper because Sabaer, a joint obligor, received notice at the addresses contemplated by the Subcontract that it shared with BBS.

Notice should have been provided to BBS by mail at the Infanteria Station address. However, despite Sanchez's representation that BBS never received notice, no reasonable factfinder could conclude that notice was improper and the court must adhere to Connecticut's interpretation of what constitutes proper notice. Miller and Porto impute Tevis's and Hallenbeck's principles into Connecticut contract law. These principles counsel determining that notice was proper. Furthermore, the Subcontract contemplates submission of the performance bond, which included an updated mailing address to which Plaintiffs sent notice. The court thus **GRANTS** summary judgment in Plaintiffs' favor on the matter of

14

**Civil No. 12-1113 (GAG)**

whether notice was properly given for termination for default.

      B.    <u>Plaintiffs' Failure to Pay Sabaer</u>

      On October 26, 2011, Plaintiffs denied Sabaer's request for payment of open invoices "[a]s long as [certain] deficiencies have not be resolved." (Docket No. 83-4.) Defendants aver that this correspondence does not constitute a final decision because it reflects ongoing discussions about how Defendants and Plaintiffs might work together to remedy the deficiencies. (<u>See</u> Docket No. 96 at 14-18.) Even if that were true, as it would be in the light most favorable to the non-movant, subsequent termination for default resolves the confusion. The November 15th letter clearly cites the deficiencies initially justifying denial of payment as the specific grounds for termination for default. If Sabaer was unsure of the finality of the denial in the October 26th letter, the November 15th letter clarified the matter.

      As previously discussed, Plaintiffs provided the Subcontractors notice of intent to terminate for default based upon the same deficiencies, and the Subcontractors never remedied the purported deficiencies or refuted the allegations. Furthermore, Defendants admit that the Subcontract's arbitration clause applies to payment controversies. They do not refute Plaintiffs' allegation that they failed to invoke their right of appeal, and they do not claim they remedied the alleged deficiencies within three days of any of the October and November letters.

      Defendants root their claim in the arbitration section's meaningful distinction between controversies concerning the Prime Contract and those arising from the Subcontract. The provision states:

> With respect to any controversy between Contractor and Subcontractor not involving the [USCE], the Prime Contract Documents or [a USCE] Claim, Contractor shall issue a decision which shall be final and binding unless, within fifteen (15) business days of receipt, the Subcontractor files a

Civil No. 12-1113 (GAG)

>notification in writing of its intent to arbitrate the controversy in accordance with Paragraph 9.c. Notification of any such claim under this Paragraph 9.b must be submitted in writing within ten (10) days of Subcontractor's awareness of the facts underlying the claim. Failure of Subcontractor to submit timely its notice of claim or notice of intent to arbitrate shall constitute an absolute bar and complete waiver of Subcontractor's right to recover on account of such claim.

(Docket No. 77 at 7.) Sabaer claims, "Federal's objections to discovery ha[ve] not allowed Sabaer the discovery of communications between DTC and the [USCE] related to the investigation of deficiencies, or the reasons for termination of DTC in the project . . . ." (Docket No. 96 at 14.) Although Sabaer should have raised these objections before the close of discovery, the record reveals that a question of fact exists over whether the controversy involved the USCE and Plaintiffs, which ostensibly eliminates the "final and binding" nature of Plaintiffs' decision. Sabaer's letter to USIC of October 26, 2011 states, "It has been over 100 days since [DTC] abandoned the job and received payment from our scope of work from the [USCE]." (Docket No. 96-7.) Whether the underlying controversy and purported abandonment involved the USCE remains an outstanding question. Therefore, summary judgment on this issue is **DENIED.**

Scheduling a trial over whether the USCE or the Prime Contract documents were involved in the controversy may be wasteful and premature. Additional evidence may exist definitively resolving the matter, and supplemental, limited discovery on this issue would allow the parties to inform the court of the USCE's position on the nature of the controversy. Accordingly, limited discovery is granted to ascertain whether this controversy involved the USCE, Prime Contract documents, or a USCE claim until September 10, 2013. Dispositive motions are due on October 10, 2013, and the timeline for any oppositions and replies thereto shall be governed by the Local Rules of the District Court for Puerto Rico.

16

**Civil No. 12-1113 (GAG)**

If no dispositive motions are filed, the court will schedule a trial.  The court emphasizes that this is limited discovery.  Discovery outside of this scope is prohibited.  Furthermore, extensions for time will not be granted.

**IV.     Conclusion**

      For the reasons stated above, the court **GRANTS in part** and **DENIES in part** Plaintiffs' motion for summary judgment at Docket No. 73 and **DENIES** Defendants' motion for summary judgment at Docket No. 71.

      SO ORDERED.

      In San Juan, Puerto Rico this 9th day of August, 2013.

S/ Gustavo A. Gelpí

GUSTAVO A. GELPI

United States District Judge
