IN THE UNITED STATES COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| FED. INS. CO., ET AL.,<br><br>Plaintiffs,<br><br>v.<br><br>EMPRESAS SABAER, INC., ET AL.,<br><br>Defendants. | CIV. NO.: 12-1113(SCC) |

**OPINION AND ORDER**

In this contract dispute, Plaintiffs and Defendants have filed cross-motions for summary judgment. Docket Nos. 148, 149. On Order of the Court, they have also filed a joint statement of facts. Docket No. 177-1. Below, after considering the parties motions, I grant summary judgment in favor of Plaintiffs.

**I. Background**

On September 8, 2009, Plaintiff DTC Engineering and Constructors, LLC, entered into a contract ("the Prime Contract") with the U.S. Army Corps of Engineers for the design

and construction of the Armed Forces Reserve Center at Fort Buchanan ("the Project"). The Prime Contract was numbered W912QR-09-C-0071, and Denise Bush was the Corps' contracting officer. In connection with the Prime Contract, Plaintiff Federal Insurance Co. issued a payment and performance bond—numbered 83039488—naming the United States as the obligee and DTC as the principal.

DTC then entered into a Subcontract Agreement with Defendant Empresas Sabaer and non-party BBS Developlers, S.E., which was dated June 16, 2010. In connection with the Subcontract Agreement, Defendant United Surety and Indemnity Co. ("USIC") issued a performance and payment bond in the amount of $2,038,500, naming DTC as the obligee and Sabaer as principal. Ten applications and certifications for payment were submitted by Sabaer and paid in full by DTC. These payments totalled $1,093,322.

On May 27, 2011, the Corps, through Bush, ordered DTC to stop all work on the site until certain issues were resolved. On the same date, DTC's project architect, Alicia Cox, relayed that order to all of the Project's subcontractors. On May 31, 2011, the Corps ordered DTC to resume work, which it did until another stop-work order was issued on July 8, 2011. Then, on

| FED. INS. CO. v. EMPRESAS SABAER | Page 3 |
|---|---|

September 28, 2011, Federal Insurance, DTC, and the United States executed a Takeover Agreement, whereby Federal Insurance agreed to complete the Project. In the Takeover Agreement, the Corps accepted Consigli Construction Co. as Federal Insurance's completion contractor. Further, the Takeover Agreement made clear that the United States had not declared DTC in default of the Prime Contract, nor had it issued to DTC any show cause notice or notice to cure or terminate.

On October 18, 2011, Federal Insurance sent a letter to Empresas Sabaer denying its request for payment because Federal Insurance "d[id] not have sufficient documentation to pay" the claim.[1] The letter also claimed that there were deficiencies in Sabaer's work, along with "anticipated backcharges that are likely to be in excess of [Sabaer's] claimed amount." The letter said that Federal Insurance would "advise [Sabaer] of additional deficiencies as information is received." On the same date, Federal Insurance also sent a letter to USIC saying that it was considering declaring Sabaer in default of the

---

1. It is uncontested that the Corps had no role in this denial of payment, nor was it involved in the subsequent denial of payment on October 26, 2011, or the decision to declare Sabaer in default.

Subcontract Agreement and requesting a conference to discuss completion. As of this date, there were no claims from the Corps to either DTC or Federal Insurance.

On October 26, 2011, Federal Insurance again denied Sabaer's request for payment, and on November 10, 2011, Federal Insurance sent Sabaer a letter communicating its intent to formally terminate Sabaer for default pursuant to article 8 of the Subcontract Agreement. Another letter was sent on November 15, 2011, formally declaring Sabaer in default and terminating its right to complete the Subcontract Agreement. Sabaer was not paid for its applications and certifications for payment numbered 11, 12, and 13. As of November 15, 2011, the balance amount of the Subcontract Agreement was $305,049.

In an Opinion and Order dated August 9, 2013, Judge Gelpí considered the parties first set of cross-motions for summary judgment. Docket No. 106. Judge Gelpí concluded that Sabaer was properly notified of the intent to terminate it for default. As to the issue of non-payment by Plaintiffs for Sabaer's open invoices, Judge Gelpí explained that Plaintiffs contended that the non-payment was due to deficiencies—the same deficiencies that precipitated the termination for default. *Id.* at 15.

Judge Gelpí specifically noted that "Defendants [had] admit[ted] that the Subcontract's arbitration clause applie[d] to payment controversies." *Id.* That arbitration clause, which is at the heart of this case, reads as follows:

> With respect to any controversy between Contractor and Subcontractor not involving the [Corps], the Prime Contract Documents or a [Corps] Claim, Contractor shall issue a decision which shall be final and binding unless, within fifteen (15) business days of receipt, the Subcontractor files a notification in writing of its intent to arbitrate the controversy in accordance with Paragraph 9.c. . . . Failure of Subcontractor to submit timely its notice of claim or notice of intent to arbitrate shall constitute an absolute bar and complete waiver of Subcontractor's right to recover on account of such a claim.

Docket No. 77, at 7.

Judge Gelpí found that the dispute between the parties was apparently covered by the arbitration clause and that Sabaer had not timely requested arbitration. Nonetheless, he could not, on the record before him, determine whether the dispute included the Corps or the Prime Contract Documents, in which case the arbitration clause would not apply. As such, he granted limited discovery on that question. From the renewed cross-motions for summary judgment, it is apparent that

FED. INS. CO. v. EMPRESAS SABAER                                         Page 6

neither the Corps nor the Prime Contract Documents were involved in the claim, and Defendants do not argue to the contrary.

## II. Analysis

As stated above, Judge Gelpí permitted a second round of cross-motions for summary judgment in order to answer a single question: did the dispute between the parties fall outside of the Subcontract Agreement's arbitration clause because it involved the Corps or the Prime Contract Documents. Judge Gelpí understood that this question alone might reserve the case. *See* Docket No. 108 ("If [the dispute involved the Corps or the Prime Contract Documents], then summary judgment for Plaintiffs must be denied. If it did not, summary judgment for Plaintiffs *must* be granted." (emphasis added)). Defendants do not even argue that the dispute did in fact involve the Prime Contract Documents or the Corps. Instead, they raise a whole host of issues outside of the circumscribed question on which Judge Gelpí permitted new discovery. Even if these matters are considered, however, summary judgment in favor of Plaintiffs is necessary.

Defendants first argue that the dispute over the payments that Plaintiffs refused to pay is a dispute under Federal's

payment bond, not the Subcontract Agreement. Defendants simply assert this argument, rather than make it with any clarity, but it is in any case foreclosed by the broad language of the Subcontract Agremeent's arbitration clause, which applies to "any controversy" between the parties that does not involve the Prime Contract Documents or the Corps. The payment dispute does not involved the Corps or those documents, and it is accordingly within the "any controversy" language, regardless of whether payment was requested under the payment bond.[2]

---

2. Defendants attempt to characterize their claim for payment as one under the Miller Act, *see* 40 U.S.C. § 3131. That law gives subcontractors a right to sue in federal court for payment on a contractor's payment bonds. 40 U.S.C. § 3133(b)(1). Such a claim, however, must be brought in the name of the United States and within one year of the date on which the subcontractor last did work for the contractor. *Id.* § 3133(b)(3). Neither Defendant has ever purported to bring a Miller Act claim, and Sabaer's counterclaim was moreover filed on August 1, 2012, *see* Docket No. 48, more than a year after the last date it provided work on the project in question. Furthermore, precedent from the First Circuit suggests that even had a Miller Act claim been filed, the Subcontract's arbitration clause would still have controlled. *See, e.g.*, *United States ex rel. Wrecking Corp. of Am. v. Edward R. Marden Corp.*, 406 F.2d 525, 526 (1st Cir. 1969) (holding that despite the Miller Act, a valid arbitration clause is given procedural priority); *see also Warren Bros. Co. v. Cardi Corp.*, 471 F.2d 1304, 1308 (1st Cir. 1973) ("[A] contractual obligation to arbitrate cannot be rendered meaningless by the expedient

| FED. INS. CO. v. EMPRESAS SABAER | Page 8 |
|---|---|

Second, Defendants argue that terminations for default under article 8 of the Subcontract Agreement are not covered by the arbitration provision found in paragraph 9.b of that Agreement. This, too, is unconvincing. Paragraph 8.a describes the circumstances under which the Contractor may, after three days notice, declare the Subcontractor in default and terminate the Subcontractor's right to proceed under the Subcontract. Docket No. 148-4, at 6. Paragraph 8.c discusses the Contractor's rights once a Subcontractor is terminated for default. Under this provision, the Subcontractor cannot receive further payments until the project is completed; after completion, the Contractor is meant to pay the Subcontractor according to some specific rules. *Id.* at 7. Finally, pursuant to paragraph 8.d, if it is "subsequently determined" that the termination for default was wrongful, the termination under article 8 is to be treated as one for convenience. *Id.* Nowhere in article 8 is there a dispute resolution mechanism, but there *is* a dispute resolu-

---

of bringing a [Miller Act] suit on a statutory payment bond."); *United States ex rel. Maverick Construction Mgmt. Servs., Inc. v. Consigli Construction Co., Inc.*, 873 F. Supp. 2d 409 (D. Me. 2012) (compelling a Miller Act case to arbitration); *United States ex rel. Clifford & Galvin Contracting, LLC v. Endicott Constructors, Corp.*, No. 12-10152, 2012 WL 6553457 (D. Mass. Dec. 13, 2012) (same).

| FED. INS. CO. v. EMPRESAS SABAER | Page 9 |
|---|---:|

tion mechanism in article 9 (which is titled "Settlement of Disputes"). *Id.* Specifically, there is the expansive paragraph 9.b, which covers "any controversy" other than those noted above. Nothing in articles 8 or 9—or anywhere else in the contract—suggest that paragraph 9.b would not apply to terminations for default under article 8.[3] To the contrary, the contract's structure indicates that while article 8 enumerates the parties' substantive rights regarding default, disputes regarding any default would be governed by article 9. Necessarily, then, I reject Defendants' argument that paragraph 9.b does not control here.

Finally, Defendants argue that Plaintiffs cannot prove that Defendants failed to comply with their obligations under the Subcontract Agreement. Indeed, many of Defendants proposed statements of fact go to this question, but I have chosen not to

---

**3.** Defendants focus on paragraph 9.e, which provides that pending resolution of any dispute, "nothing shall excuse Subcontractor from proceeding with prosecution of the" project. Docket No. 148-4, at 7. According to Defendants, this provision implies that article 8 terminations are not governed by paragraph 9.b, because after such a termination there would be no work ongoing. But given the broad "any controversy" language in paragraph 9.b, I understand paragraph 9.e to be a pro-Contractor provision applying only where work is ongoing and the Subcontractor has not been terminated.

| | |
|---|---|
| FED. INS. CO. v. EMPRESAS SABAER | Page 10 |

include them above because they are plainly outside the scope of this case. Given that paragraph 9.b's arbitration clause applies, and given that Defendants failed to request arbitration, the matter of default is closed. This argument is therefore rejected as well, Defendants cross-motion for summary judgment is DENIED, and Plaintiffs' motion for summary judgment is GRANTED as to liability.

Turning to damages, Plaintiffs allege that they are owed $672,758 plus a contractual award of 10% in overhead as well as attorneys' fees. They arrive at this number by adding the amounts paid to Consigli and Terrasol to correct deficient work ($155,772), to Terrasol as Consigli's subcontractor to complete the original scope of Sabaer's work ($772,577), as well as payments to Consigli as completion contractor ($46,562) and for insurance on the completion and corrective work ($2,896). From the $977,807 in completion and correction expenses, Plaintiffs then give Defendants a credit of $305,049, which is the remaining balance under the original Subcontract Agreement, arriving at damages of $672,758.

Defendants object to this amount for several reasons. First, they claim that a portion of the expenses that Plaintiffs are claiming as damages actually correspond to work done to

correct Plaintiffs' own negligence—that is, work done "to bring the job site to the same condition as it was before the time in which Sabaer and others were asked to leave the project." Docket No. 151, at 10. However, Defendants cite nothing to substantiate this claim, and so it is rejected. Next, Defendants claim that certain line items in the payments made for completion/correction work duplicate work that Sabaer had already done, and for which it should therefore not have to pay. However, Sabaer was terminated for faulty work, and so it stands to reason that some of the work it did needed redoing. Sabaer points to nothing in the record suggesting that these payments were improper or were not done to repair the claimed deficiencies in Sabaer's work. Finally, Defendants claim that there is a question of fact as to whether Plaintiffs really paid Consigli, a fact which Plaintiffs support via an affidavit from Robert Bullock, the project manager for Lovett Silverman Construction Consultants, which was hired to investigate "what work needed to be corrected and/or completed" after Sabaer's termination, as well as administering the completion work. Docket No. 148-3, at 1. According to Defendants, this is insufficient proof that Consigli was actually paid. *See* Docket No. 151, at 11 ("Federal cannot allege[] that [it]

suffered damages by only providing a statement of [a] third party (Robert Bullock) of the monies paid by Lovett Silverman Construction Consultants, Inc. to Consigl[i]. Federal has to show that [it] really paid Consigl[i]."). However, Defendants cite no authority supporting its position, which conflicts with the general principle that a person may testify to information within his personal knowledge, as Bullock affirms these payments are. This objection, too, is therefore rejected.[4] I find, therefore, that Defendants owe Plaintiffs damages of $672,758.

### III.   Conclusion

For the reasons stated above, Plaintiffs' motion for summary judgment is GRANTED, and judgment will be entered against Defendants jointly and severally in the amount of $672,758, plus 10% overhead,[5] *see* Docket No. 148-4, at 7, for a

---

4. Defendants also frame this objection as a matter of discovery obligations, arguing that Plaintiffs had a duty to turn this information over and that they failed to do so. Indeed, on December 19, 2013, I granted the parties a short period in which to do damages discovery. *See* Docket No. 135. But as to the materials Defendants now deem important, Defendants never filed any motion to compel—not even after Plaintiffs filed their motion for summary judgment. I thus reject Defendants discovery objection as untimely.

5. Plaintiffs also request prejudgment interest, but I deny that request because they have not pointed to any authority justifying their right to

| FED. INS. CO. v. EMPRESAS SABAER | Page 13 |
|---|---|

total of \$740.033.80;[6] judgment will also be entered dismissing Defendants' counterclaims. Defendants cross-motion for summary judgment is DENIED.

IT IS SO ORDERED.

In San Juan, Puerto Rico, this 17th day of December, 2014.

S/ SILVIA CARREÑO-COLL

UNITED STATES MAGISTRATE JUDGE

---

such interest.

6.  Plaintiffs have fifteen days to prove their attorneys' fees, after which Defendants will have 15 days to file an opposition. Judgment regarding those fees will be separately entered after adjudicating the fees motion.